1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ONEWEST BANK, FSB,

4                  Plaintiff,

5            v.                        10 Civ. 4855 SHS

6   HSBC BANK USA NATIONAL ASSOCIATION,
    AS TRUSTEE OF THE DEUTSCHE ALT-A
7   SECURITIES MORTGAGE LOAN TRUST,
    SERIES 2006-AR5,
8
                   Defendant.
9
    ------------------------------x
10
                                      November 3, 2011
11                                    2:30 p.m.

12

13  Before:

14                      HON. SIDNEY H. STEIN,

15                                      District Judge

16

17                      APPEARANCES

18

19  O'MELVENY & MYERS, LLP
         Attorneys for plaintiff
20  BY:   ANDREW J. FRACKMAN, Esq.
         KENNETH MURATA, Esq.
21                 Of counsel

22  MAYER BROWN, LLP
         Attorneys for defendant
23  BY:   MICHAEL O. WARE, Esq.
         JENNIFER M. ROSA, Esq.
24                 Of counsel

25

1     (In open court)

2     (Case called)

3          THE COURT:  Good afternoon.  Please be seated.  For

4     disclosures, I know Mr. Frackman.  From where?  From Paul

5     Weiss?

6          MR. FRACKMAN:  From Paul Weiss.

7          THE COURT:  Our Paul Weiss days.

8          MR. WARE:  Mr. Frackman mentioned that to me

9     yesterday, and the defendant has no questions or concerns.

10         THE COURT:  All right.  I have questions and concerns

11    about this case, though, so let me ask them.  I am not certain

12    that this is an appropriate action for declaratory judgment as

13    opposed to just giving some succor to HSBC Bank.  I am not

14    quite sure why you think it is a live enough controversy for I

15    think it is 2201.  Somebody should tell me about that, that is

16    one thing.

17         MR. FRACKMAN:  Your Honor, an Andrew Frackman.

18         THE COURT:  I am sorry.  Let me do a couple of

19    questions.

20         MR. FRACKMAN:  Sure.

21         THE COURT:  Yes, 2201, in a case of actual controversy

22    within its jurisdiction.  I am not sure what the actual

23    controversy is.  That is one point.

24         The second thing is the system breaks down in a way

25    when the adversary system isn't engaged, and we had OneWest

1    Bank seeking a declaratory judgment and HSBC Bank as the

2    trustee saying it doesn't oppose.  So there is nobody opposing

3    the request.  I want to make sure that all of the stakeholders

4    here have been heard from so that I understand their positions.

5              To the extent I can understand that, certainly the

6    homeowners -- the mortgage holders -- sorry -- not the ones who

7    hold the mortgage, but homeowners themselves, the ones who have

8    taken out the loans from the banks secured by the mortgages

9    would be seeking modifications, so they would be interested in

10   the declaratory judgment being issued.

11             OneWest Bank is the movant here.  HSBC says it doesn't

12   oppose it.  It's surveyed the certificate holders in all but

13   two trusts.  25 percent or more, which I think is the operative

14   number of the operative percentage, have said that

15   modifications can be made, as I understand it.

16             So my question is:  Are those all the people with an

17   interest in this motion?

18             So let's start with those two questions, Mr. Frackman.

19             MR. FRACKMAN:  Yes, your Honor.

20             First, when I first got involved in this last week,

21   because I was uninvolved in the early stages of this matter, I

22   took a look at the papers and I recognized that the filing was

23   not done in the most user-friendly way for the court and

24   undoubtedly for the clerks.

25             If we're going to talk about the underlying documents

1    that are referenced in the papers, what I did was I took one

2    set of them and I prepared a notebook that actually has

3    numbered pages with the relevant language highlighted.  So it

4    might be helpful to --

5              THE COURT:  You can pass it up.  I, in effect, have

6    done that already.

7              MR. FRACKMAN:  I suspect you may have done it already,

8    and I frankly apologize for not having done it.

9              THE COURT:  Stickies are very useful.

10             MR. FRACKMAN:  This is just one of the -- just so you

11   all know, this binder contains one of the series of

12   securitizations involved here, the PSA, the AARA and

13   supplemental prospectus relating to that series all in one

14   place.  We highlighted the language.  Maybe we won't need it,

15   but I wanted to hand it up first.

16             So the issue, as the court probably has figured out,

17   is that there are proceedings in state court where --

18             THE COURT:  Is that Suffolk County proceeding that is

19   the only referenced still a live proceeding?

20             MR. FRACKMAN:  I believe there were two in Suffolk

21   County and I don't know if there are others as well, frankly.

22   I know what happened in those is that there was a foreclosure

23   proceeding.  The homeowner wanted OneWest to modify the

24   mortgage.  We explained to the court that we could not by

25   ourselves modify it without the consent of HSBC.  They didn't

1    really believe us.  That put us in a very difficult situation,

2    and just to give you a sense of the scope here, there are

3    approximately 780 of the approximately 2800 mortgages included

4    in these securitized pools that have applied for modification.

5              In our experience, about 50 percent of those applying

6    complete the documentation and are, therefore, eligible for

7    modification.

8              THE COURT:  This is under HAMP?

9              MR. FRACKMAN:  Yes, talking about 400 homeowners.

10             THE COURT:  They want modifications under HAMP.

11             You say you can't modify because primarily of the

12   MMLPSA, and so you want HSBC to help you out, and HSBC says we

13   are not going to help you out here unless you agree to

14   indemnify us, and there is a standoff between two banks that

15   are not movable objects in this regard because everybody wants

16   complete safety.

17             Why is that an actual controversy sufficient to give

18   me what's discretionary jurisdiction, I think discretionary.  I

19   don't have to accept any declaratory judgment action.  I need

20   to understand its real controversy.  What happened in those two

21   Suffolk County cases?

22             MR. FRACKMAN:  What happened was we couldn't modify

23   the mortgages.  The one thing that is clear here, and it

24   relates to your question, I think it is implicit in your

25   question, everyone would like to be able to modify.

 1          THE COURT:  You took the position you couldn't modify

 2     the mortgages, but you're asking me to take the position that

 3     you can modify the mortgages, and that's really all you're

 4     doing.  You are saying, "Court, you should decide the issues so

 5     that I don't have to take a position."

 6          MR. FRACKMAN:  So we don't face liability from HSBC or

 7     others with respect to that.

 8          THE COURT:  Is that sufficient?

 9          MR. FRACKMAN:  We believe it is, and HSBC can talk to

10     this as well.  We need HSBC to agree.  They don't agree.  We

11     are at risk otherwise.  There is a tension between some of the

12     documents.

13          THE COURT:  There is, there is.  I am just not quite

14     sure why, why you need me to give you an insurance policy.

15     That is true of HSBC.  Mr. Frackman is looking to HSBC for

16     help.  Were it not to help, he is fobbing it off on you since

17     you fobbed it off on OneWest by saying give us indemnification.

18     Where is the controversy under 2201?

19          MR. WARE:  The controversy, your Honor, and Mr.

20     Frackman, as the court may know, is a super lawyer, new to the

21     case, OneWest was on the horns a dilemma in June of 2010.  It

22     faced --

23          THE COURT:  You have lawyers.  As you just said, they

24     have very good lawyers.  They can construe the documents as

25     well and decide what they're going to do.  Go ahead.

1    MR. WARE:  One piece of background.

2         In the early years of the foreclosure crisis,

3    servicers would sometimes cite investor refusal or investor

4    permissions as a ground on which to refuse modifications, and

5    some studies indicated that this wasn't always true, and there

6    are additionally stories, very epigrammatical stories by

7    drilling down, by foreclosure defense counsel and advocates in

8    state courts in finding it really wasn't true.  There is a

9    skepticism in the foreclosure courts when the servicer says I

10   can't help you, my hands are tied by the investors.

11        Certainly that was the case with Justice Spinner in

12   Suffolk County and now in many courts.  For example, in Nevada

13   there is a court rule that is a nonjudicial foreclosure

14   statement.  The court rules you have to show up with this power

15   to modify the loan even if the servicer doesn't actually have

16   the authority to do that.

17        There was some skepticism and threats of sanctions on

18   that one side.  On the other side, OneWest didn't want to do --

19   they know the documents are problematic and they didn't want to

20   do it in the face of those bad documents.

21        THE COURT:  Don't you have 25 percent or more of the

22   certificate holders authorizing you to make the modifications,

23   and that is all you need under the documentation in all but two

24   of the trusts?

25        MR. WARE:  Your Honor, probably not.  It is not the

1    best set of securitization papers ever done.

2          25 percent, we feel, is more than enough to direct the

3    trustee to take a position in the lawsuit.  It may not be

4    enough to remove from the servicing agreement a provision

5    that's effective.  This is something that caused consternation

6    on the HSBC side.

7          In many documents it will be quite clear, there will

8    be different thresholds for different types of actions by the

9    trustee, and with 25 percent being the most common allows most

10   forms of operation and certain modifications to the documents

11   requiring higher threshold.  It is unclear in these it isn't a

12   hundred percent for the trustee to directly do what I think

13   everybody, just about everybody would like to see done, which

14   is to see the servicing agreement reformed to excise the

15   restriction on OneWest.

16         The court asked whether all the interested parties

17   were among those whom the court identified, and the answer is

18   yes.  So we have borrowers, the servicer, the trustee and the

19   certificate holders.  At the beginning --

20         THE COURT:  And everybody -- again I am using the 25

21   percent figure.  If I am wrong, tell me.  Using the 25 percent

22   figure, everybody except arguably the two trusts, in essence,

23   is saying let's allow the modifications under HAMP as long as

24   there is, I think, a positive net value, if I remember.

25   Everybody is asking that that be done?

1    MR. WARE:  That's the net economic effect of what the

2    certificate holders have directed, the actual directions are

3    facing the litigation as opposed to the servicing agreement

4    itself.

5    We are comfortable that being directed to take this

6    position in the litigation and encouraging a certificate holder

7    who thought we were acting in derogation of his rights to speak

8    up.

9    THE COURT:  And nobody has filed anything at least on

10   the ECF system here in court.  The chambers has received

11   nothing.

12   MR. WARE:  We have received nothing.  We have a very

13   wide-open channel to the investors and we have made available

14   executives to talk to them and answer their e-mail inquiries,

15   and no one has told us not to let this go forward.

16   THE COURT:  So where is the controversy?

17   MR. WARE:  The controversy was quite real in June of

18   2010 because at that time OneWest thought that the documents

19   gave it certain rights, and the counterparty was refusing, and

20   OneWest faced the prospect of liability and if it couldn't get

21   that problem resolved.

22   Over time some of the sting has come out of the

23   controversy in the sense that HSBC is no longer opposing as a

24   practical matter the HAMP modifications.  I should emphasize

25   that HSBC is pro-modification and in our own portfolio has done

1    hundreds of thousands, but here our situation is a little

2    different.  We have these documents.

3            A judgment, whether it is reformation of the contract

4    or declaratory judgment or injunction, that has the effect of

5    excising the restriction on modification from the servicing

6    agreement is clearly something that its trustee feels it has

7    been directed to let happen or to procure, and that doesn't

8    have the 100 percent threshold that is arguably present for us

9    directly to modify that agreement with the servicer.

10           So there is a controversy in the sense that in the

11   declaratory judgment sense that people on both sides of the

12   aisle in this case fear litigation from different vectors

13   unless these documents can be given a definitive construction

14   on which there is certainly grounds for controversy.  I think

15   that's the thrust of declaratory judgment controversy in the

16   2201 sense.

17           THE COURT:  The stretch?  I think the main thing here

18   is, as near as I can tell, all the actors are interested in the

19   modifications being permitted consistent with the parameters of

20   HAMP.  Certainly the policy issue supports the modifications in

21   terms of there being I think a specific part of the statute

22   that says its relief for the homeowners, that is the purpose

23   behind the statute here.

24           But let's turn to the specific documents.  Let me tell

25   you how I see it in an overview and then just tell me if you

1    agree with the overview.  The MMLPSA is the document that

2    governs all of the trusts.  That defines OneWest as the loan

3    servicer's obligations.  Section 11.01 says that, in essence,

4    OneWest shall not permit any modifications with respect to any

5    mortgage loan that would change the mortgage interest rate,

6    defer or forgive the payment thereof or of any principal or

7    interest payments, and then it goes on.

8          So that, it seems to me, is the main documentary

9    stumbling block here to the MMLPSA, that OneWest shall not

10   permit any modifications with respect to mortgage loans, to

11   change the interest rate, deferral or forgive payment thereof.

12         OneWest, can you sign onto this statement I just made?

13         MR. FRACKMAN:  Yes, that is the problematical

14   document.

15         THE COURT:  HSBC?

16         MR. WARE:  Yes, your Honor.

17         THE COURT:  I want to see what the areas of agreement

18   here are.  Obviously, the modifications one would assume very

19   definitely involve changing of the interest rate, deferring or

20   forgiving payment of principal.  That is the key document here,

21   the 2005 document.

22         Then we have later documents, I think it is relevant

23   they're later and I think OneWest makes that point, we have the

24   pooling and servicing agreement which sets up each trust and

25   states that the loan shall be serviced consistent with, "those

1    customary mortgaging servicing practices of prudent mortgage

2    servicing institutions."

3           And then there are some scattered references to

4    modification, but nothing really helps either side here.  I

5    think the main point here is the language I've quoted at least

6    insofar as the PSA is concerned.  The loans are going to be

7    serviced consistent with those customary mortgage servicing

8    practices of prudent mortgage servicing institutions.

9           OneWest, do you agree with that?

10          MR. FRACKMAN:  Yes, your Honor.

11          THE COURT:  HSBC?

12          MR. WARE:  Yes, your Honor.

13          THE COURT:  Okay.  The third document, AARA,

14   assignment, assumption and recognition agreement.  I think that

15   drops out of the analysis.  It simply allows Deutsche Alt-1

16   Securities Mortgage Loan Trust to step into the shoes of DB

17   Structured Products.  So I don't think that is central to the

18   analysis.

19          Then we have the fourth document which is the

20   prospectus supplement filed with the SEC, and that is the best

21   argument for this declaratory judgment being granted.  It says

22   if the mortgage loan is in default, and it's in the best

23   interests of the certificate holders -- and it is in the best

24   interests of the certificate holders, the servicer -- that is

25   OneWest -- will permit servicing modifications of the mortgage

1   loan rather than proceeding with foreclosure subject to certain

2   limitations.

3          OneWest, are you on board with that analysis also?

4   That is your strongest straw?

5          MR. FRACKMAN:  Yes, your Honor, it is.

6          THE COURT:  HSBC?

7          MR. WARE:  It is its stronges straw.

8          THE COURT:  Yours, too.  You don't oppose the motion.

9          How, how do you make the leap from ERISA law to having

10  any binding effect of the prospectus supplement, and by that I

11  mean as follows:

12         I agree with your statement that the SPD, summary plan

13  description, can sometimes trump the plan documents under ERISA

14  because the plan participants have all received the summary

15  plan document, and if any of you are participating in those

16  things, that is what you read, by and large.  So that makes

17  sense to say if there are certain terms in the SPD that are

18  inconsistent with the plan documents themselves, under certain

19  documents the SPD controls.

20         It seems to me -- and you argue, both of you, that so,

21  too -- here the prospectus supplement was filed with the SEC,

22  not given to all the certificate holders, but filed with the

23  SEC, and it permits the modifications.  I'll state this more

24  strongly than I believe it, just to make the point.

25         Why in the world should I use ERISA law in this

1    context when this is governed by New York law?  Do you both

2    agree on that as well?

3              I just don't know what the connection is between ERISA

4    law and the contract law.  Sir?

5              MR. FRACKMAN:  I think the best argument is that given

6    the absence of any perfect analogue elsewhere --

7              THE COURT:  In other words, you can't find any law in

8    support?

9              MR. FRACKMAN:  Right, or against it, I mean one way or

10   the other.

11             Where you have a tension between outward-looking

12   documents, in this case the prospectus supplement that goes to

13   the parties that are really the arguably ones in interest, the

14   investors, and this earlier document --

15             THE COURT:  Does the prospectus supplement go to the

16   certificate holders?

17             MR. FRACKMAN:  I don't know whether it is the

18   certificate holders.

19             THE COURT:  I thought it was simply filed with the

20   SEC?

21             MR. WARE:  It is supposed to go to the initial

22   purchasers, your Honor.

23             THE COURT:  All right.

24             MR. FRACKMAN:  They get this document that clearly

25   anticipates modifications or the possibility of modifications,

1  and you have an earlier document that would seem to be

2  inconsistent with what we put into a public SEC filing.  This

3  is the closest analogous we could come up with.

4         I recognize it is not perfect, but we're trying to

5  come up with a way to get to the right result here that doesn't

6  trespass on any of the parties' interests.

7         THE COURT:  That is exactly what I am trying to do.  I

8  want to get to a result that permits the homeowners to have

9  modifications consistent with HAMP because that is what the

10 statute is, and I think I can obviously take notice of the

11 financial crisis that the country has been involved in in terms

12 of home ownership.  I certainly don't want to do that at the

13 cost of overriding clear contractual language.

14        MR. FRACKMAN:  Understood.  Here we have what I would

15 say is a pretty gross distinction between that original

16 document and all the documents that follow, including the

17 documents by which the subsequent entities step into the shoes

18 of DB Structured Products, which was the counterparty on that

19 original document.

20        Your Honor, you didn't seem to think the AARA was

21 particularly relevant, but that is the document by which

22 Deutsche Alt-A stepped into the shoes of --

23        THE COURT:  And that --

24        MR. FRACKMAN:  And that document also anticipated

25 modifications.

1        THE COURT:  Show me that then.  Show me.

2        MR. FRACKMAN:  If you have your binder --

3        THE COURT:  Let me just go to my Deutsche Alt-A, if I

4   can find it because, as I say, it is jammed up.  We may end up

5   in the same place.

6        Give me your cite.

7        MR. FRACKMAN:  If you go to the binder I handed up, it

8   is the page stamped D-274.  The assignment assumption and

9   recognition agreement begins on page D-260.  With that document

10  are some forms, some exhibits, one of which is Exhibit 2,

11  entitled, "Standard file codes delinquency reporting."

12       And on D-274, you see there is a field for a loan

13  modification at the bottom of the page.  Then --

14       THE COURT:  So that tells you --

15       MR. FRACKMAN:  That the parties anticipated the

16  possibility that there might be loan modifications.  Then if

17  you go to the page numbered D-279, which includes something

18  called Exhibit 2, the standard file codes delinquency

19  reporting, too, but it is a different part of this document.

20  You see again the loan modification reference.

21       THE COURT:  Yes.

22       MR. FRACKMAN:  So if there had been no possibility of

23  loan modifications, then our argument is it wouldn't be

24  contained in here as a possible field for reporting purposes.

25       It shows that even Deutsche Alt-A, when they stepped

1   into the shoes of DB Structured Products, I don't want to

2   overstate it, but they knew -- this isn't a state of mind

3   matter, but it is reasonable for them to have anticipated that

4   there was some possibility of modifications of the underlying

5   mortgages notwithstanding what was in the MMLPSA documents to

6   begin with.  That is why I think the AARA has some relevance,

7   though not the power of the SEC filing in supplemental

8   prospectus.

9           THE COURT:  That is a fair point.  Is there anything

10  else you wanted to tell me, Mr. Frackman?

11          MR. FRACKMAN:  No, your Honor.  I think that this is,

12  I do think there is a case in controversy here.  I understand

13  it is not the most perfect of cases, but there is no question

14  that absent some resolution of this conflict between the

15  documents, OneWest is faced with potential exposure liability

16  risk any time it wants to do what HAMP requires us or

17  encourages us to do, which is modify the underlying mortgages,

18  which we want to do.

19          THE COURT:  It clearly encourages that.  I think it

20  also says if it can't be done because of loan documentation, it

21  can't be done, but the overriding policy interest is in

22  modification as set forth in that statute as I read it.

23          MR. FRACKMAN:  Correct, and putting us at risk of this

24  exposure every time we want to act correctly under HAMP creates

25  a controversy.  Unless HSBC accedes and agrees that we can do

1  this, we have a disagreement over what the documents mean and

2  permit, that is a contract dispute.

3          THE COURT:  Thank you.  HSBC, what do you want to tell

4  me that you haven't already, if anything?

5          MR. WARE:  The gross-up or prospectus supplement -- I

6  have been doing these bonds so long, I am starting to use the

7  lingo.

8          THE COURT:  Bond lawyers are a different breed.

9          MR. WARE:  The prospectus supplement is the

10  investor-facing document.  I don't think it has exactly the

11  significance, that it has significance for exactly the reasons

12  Mr. Frackman said because OneWest isn't a party to that.

13          This is the same reason I don't think that the ERISA

14  cases are relevant because in the ERISA, the summary plan

15  document is issued by the plan sponsor, and if it is more

16  generous than the actual documents, it is fair to charge them

17  with that.  Here OneWest isn't in those intermediate documents.

18  The certificate holders for which the trustee acts bought bonds

19  on the basis of a gross-up that said we would have reasonable

20  and customary.

21          They didn't know necessarily about the servicing

22  agreement, the standing agreement under which OneWest Bank's

23  predecessor had sold bonds into this securitization machinery

24  at Deutsche.  To me, the bright answer is to reform the

25  servicing agreement.

1          THE COURT:  All you need is a declaration of rights.

2     You don't need the injunction of --

3          MR. WARE:  A declaration is fine, but probably more

4     precisely right is the equitable relief of reforming the

5     servicing agreement.  We would certainly be happy to work with

6     the plaintiff's lawyers to draw up a decree like that if it

7     suits the court's purposes.

8          THE COURT:  You don't need, I repeat, you don't need

9     the injunctive language as long as you have the declaratory

10    language.

11         MR. WARE:  That's right.

12         THE COURT:  All right.  I would like to resolve this,

13    so I want to step off the Bench.  Can you come back at 4:00,

14    all right?  Everybody can be here at 4:00.  Come back at 4:00

15    o'clock.  If I can have something for you, I will have

16    something for you.

17         (Recess)

18         (In open court)

19         THE COURT:  Please be seated, counsel.  My decision is

20    as follows:

21         This is a declaratory judgment action brought under 28

22    U.S.C. 2201, by OneWest Bank FSB, as loan servicer against HSBC

23    Bank USA National Association, as trustee of the Deutsche Alt-A

24    Securities Mortgage Loan Trust.  The amended complaint added a

25    variety of different series, so there are 10 trusts altogether.

1    It was originally one trust, if I recall correctly.

2         OneWest seeks a declaration that, "the statutory safe

3    harbor of 15 U.S.C. 1639 A.b, which is the Helping Families

4    Save Their Homes Act of 2009, applies to any HAMP modifications

5    OneWest Bank makes with respect to HAMP-eligible loans held by

6    the trusts, that there is no liability based solely upon the

7    implementation by OneWest Bank of a HAMP modification of a

8    trust owned loan.

9         The statutory safe harbor that the loan servicer seeks

10   states, "A servicer that is deemed to be acting in the best

11   interests of all investors or other parties under this section

12   shall not be liable to any party who is owed a duty under

13   Subsection (a)(1), and shall not be subject to any injunction,

14   stay or other equitable relief to such party based solely upon

15   the implementation by the servicer of a qualified loss

16   mitigation plan." 15 U.S.C. 1639 A.b.

17        I have determined that this is a case of actual

18   controversy pursuant to 28 U.S.C. 2201 and have accepted

19   jurisdiction over this declaratory judgment action, and the

20   parties know declaratory judgment actions are always

21   discretionary in the sense the court does not have to accept a

22   declaratory judgment action. Given the public policy at

23   interest here and the existence of a variety of parties, I have

24   accepted jurisdiction.

25        The relevant documents which we discussed during the

1    oral argument earlier today are as follows:

2              First is the MMLPSA which governs all of the relevant

3    trusts in this action.  Section 11.01 of Exhibit 8 to the

4    MMLPSA provides that the loan servicer "shall not permit any

5    modification with respect to any mortgage loan that would

6    change the mortgage interest rate, defer or forgive the payment

7    thereof or of any principal or interest payments, reduce the

8    outstanding principal amount (except for actual payments of

9    principal), make additional advances of additional principal or

10   extend the final maturity date on such mortgage loan."

11             In these papers it is found in Exhibit A to the

12   declaration of Aaron Wade, dated December 6, 2010.  That is the

13   first document.  As you see, it is the first document in time.

14   As you see, it says that the loan servicer shall not permit any

15   modification with respect to a mortgage loan that changes the

16   mortgage interest rate.

17             The second document is the PSA.  The PSAs create the

18   various trusts and they state that the loan shall be serviced

19   in a manner consistent with, "those customary mortgage

20   servicing practices of prudent mortgage servicing

21   institutions."  So the second document certainly squints in the

22   direction of permitting modifications because it says, in

23   mandatory fashion, that the loans are going to be serviced in a

24   manner consistent with customary mortgage servicing practices

25   of prudent mortgage servicing institutions.  Part of my job is

1    to see how those are defined.

2            The third document is the AARAs, and those, in effect,

3    substituted Deutsche Alt-A securities mortgage loan trusts to

4    step into the shoes of DB Structured Products.  The AARAs do

5    reference loan modifications, and as the attorney for OneWest

6    pointed out earlier, the reference certainly suggests that

7    modifications are permissible.

8            The forms have words "modification for the loan," in a

9    section entitled, "Form of Monthly Servicer's Report," which

10    again suggests that the servicer can modify the loan, and it

11    also has the words, "loan modification" in a separate section

12    entitled, "Standard File Codes-Delinquency Report."

13            So again the first document, the MMLPSA says no loan

14    modifications.  The second and third documents, the PSAs and

15    the AARAs certainly suggest that it is possible, especially if

16    we can determine what the customary mortgage servicing

17    practices of mortgage servicing institutions are.

18            The fourth document is the document that is the

19    strongest in favor of OneWest Bank and in favor of HSBC Bank

20    because HSBC Bank does not oppose the motion.  It specifically

21    states that both on the first page of its response to the

22    motion.  It did not file an opposition.  It filed a response.

23    Indeed, the attorney for HSBC Bank here today said once again

24    that HSBC does not oppose the motion.

25            The fourth document, I say, is the prospectus

1    supplement.  I am informed that in bond-speak, it is called the

2    "pros sup," and that the specific one for the 2006 AR5 trust

3    provides that, "In instances in which a mortgage loan is in

4    default or if default is reasonably foreseeable, and if

5    determined by the servicer to be in the best interests of the

6    certificate holders, the servicer may permit servicing

7    modifications of the mortgage loan rather than proceeding with

8    foreclosure. The servicer's ability to perform servicing

9    modification is subject to certain limitations in the pros

10   sup," and I've quoted from a pros sup for the 2006 AR5 trust.

11        The prospectus supplements for the other trusts

12   contains substantially similar language or actually language

13   that is even more expansive in permitting modifications than

14   that contained in the prospectus supplement for 2006 AR5 trust.

15        So there you have the four sets of documents.  Again

16   the very first one in time does not permit modifications.  The

17   next two suggest that they're certainly possible.  The fourth

18   one certainly permits service modifications rather than

19   proceeding with foreclosure and if determined by OneWest to be

20   in the best interests of the certificate holder.

21        How do the parties line up here?

22        Not only do the parties to this litigation, OneWest

23   Bank and HSBC Bank as trustee, urge on the court the relief

24   sought, but all the relevant stakeholders here seem to consent

25   to the relief, or at a minimum have not voiced opposition.

1       The loan servicer, OneWest Bank, seeks it.  The

2   trustee, HSBC Bank, does not oppose it.  The homeowners at

3   interest, to the extent the court and the parties can

4   determine, certainly seek it because it is the homeowners

5   seeking loan modifications based on the HAMP program that are

6   really behind this litigation because it is they that were

7   seeking modifications.  OneWest Bank felt obligated to seek a

8   declaratory judgment rather than face potential liability by

9   modifying the loans pursuant to HAMP.  So all those parties are

10  seeking the relief sought.

11      What about the certificate holders here, because HSBC

12  is the trustee for the loan trust and the certificate holders,

13  the owners of these loans?  The owners were surveyed by HSBC,

14  and in each trust, all of the trusts -- I take it that is

15  approximately 80 -- had more than 25 percent of the certificate

16  holders indicate that they either approved the ability of

17  OneWest to modify the loans or didn't oppose it.  In at least

18  some of the trusts, the 25-percent level gives HSBC Bank the

19  go-ahead with the modifications or at least permit OneWest Bank

20  to do so.

21      So there appears that there is a significant majority

22  of the certificate holders who either want this modification or

23  want this declaratory judgment or don't oppose it, and of

24  importance to the court is that HSBC indicated to any of the

25  certificate holders they have the ability to contact the court

1    directly to make their views known, and there is no filing of

2    any certificate holder on the court's electronic case filing

3    system, and my chambers have not received any notification that

4    I am aware of, either, from any of the certificate holders.

5         So it appears that all of the relevant actors here

6    want there to be loan modifications or at least the ability of

7    OneWest Bank to modify the loans consistent with the HAMP

8    program.  I have Rule 56.1 statements by each of the parties,

9    and they essentially are in agreement.  There is really no

10   dispute of fact here.

11        The parties are also in agreement that New York law

12   controls; and, therefore, because there is no extrinsic

13   evidence that either of the parties point me to, this presents

14   a question of law for the court and can be determined on

15   OneWest's motion for summary judgment.

16        See Hartford Accident & Indemnity Co. v. Wesolowski,

17   33 NY 2d. 169-172 (1973); accord Compagnie Financiere de CIC,

18   et de L'Union Europeenne v. Merrill Lynch Pierce Fenner &

19   Smith, Inc., 232 F.3d 153, 158 (2d Cir. 2000) in addition to

20   the four sets of documents, and I repeat the latter three in

21   time all permit modifications, and certainly the last one in

22   time, the prospectus supplements explicitly permit

23   modification.

24        In addition to the documents themselves, I do note

25   that federal policy strongly and explicitly currently

encourages mortgage servicers such as plaintiff to take all

steps reasonably possible to assist distressed homeowners under

HAMP as long as the loan documents permit modifications, and

that is what we're dealing with.

     As I said, the PSAs require or permit the loans to be

serviced in a manner consistent with, "those customary mortgage

servicing practices of prudent mortgage servicing

institutions."  It is clear, and it is important to the court

in this context, that loan modifications implemented pursuant

to HAMP constitute a customary mortgage practice.

     Specifically, Section 129 of the Helping Families Save

Their Homes Act of 2009 provides that qualified loss mitigation

plan guidelines issued by the Secretary of the Treasury under

the Emergency Economic Stabilization Act of 2008, "shall

constitute standard industry practice for the purposes of all

federal and state laws."  That is 15 U.S.C. 1639 A.b.

     So that handles the connection between the PSA and the

ability to modify the loans because the Helping Families Save

Their Homes Act of 2009 states that that is the standard

industry practice is, indeed, implementing loan modifications

pursuant to HAMP, which is what this lawsuit is all about.

     Given all of those factors, therefor, it is my

determination that the motion for summary judgment by OneWest

is granted, and the determination, the declaration is that

given the documents themselves, the agreement of the parties to

1   this litigation and essentially all other stakeholders, that

2   loan modifications are desirable as well as the strong current

3   federal policy in favor of loan modifications, I conclude that

4   the statutory safe harbor of 15 U.S.C. 1639 A.b applies to the

5   HAMP modification OneWest as loan servicer makes with respect

6   to any HAMP-eligible loans held by the relevant trusts.

7           I am assuming that the modification will result in a

8   positive net present value of the loan to the owner of the

9   loan, but I believe, indeed, that is a prerequisite of any HAMP

10  modification.  Am I correct, gentlemen?

11          MR. FRACKMAN:  That is my understanding, your Honor.

12          MR. WARE:  Yes, your Honor.

13          THE COURT:  That is my determination.

14          I will enter a minute order saying for reasons entered

15  on the record today, the motion for summary judgment is

16  granted, and it is the court's determination that -- and I will

17  restate the paragraph that has the declaration I just read into

18  the record.  Thank you very much.  I appreciate it.

19          (Court adjourned)

20

21

22

23

24

25